IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| ANTHONY H.,[1] <br>     Plaintiff, <br> <br> v. <br> <br> KILOLO KIJAKAZI, <br> Acting Commissioner of Social Security, <br>     Defendant.[2] | Civil Action No. 3:21-cv-00015 <br> <br> REPORT & RECOMMENDATION <br> <br> By:   Joel C. Hoppe <br>         United States Magistrate Judge |

Plaintiff Anthony H. asks this Court to review the Commissioner of Social Security's final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the applicable law, I cannot find that substantial evidence supports the Commissioner's decision. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

2

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Anthony applied for DIB in June 2018, Administrative Record ("R.") 191–97, ECF No. 13, alleging disability because of chronic obstructive pulmonary disease ("COPD"), disc disease, lung tumors, bipolar disorder, paranoid schizophrenia, and suicidal thoughts, R. 213. He alleged that he became disabled on April 18, 2018. R. 191. He was forty-five years old, or a "younger person" under the regulations, on his alleged onset date. R. 65, 82; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied his claim initially in December 2018, R. 63, 65–79, and upon reconsideration in April 2019, R. 80, 82–99. In February 2020, Anthony appeared with counsel and testified at an administrative hearing before ALJ Brian Rippel. R. 36–61. A vocational expert ("VE") also testified at this hearing. R. 55–60.

ALJ Rippel issued an unfavorable decision on March 12, 2020. *See* R. 20–31. He found that Anthony had not engaged in substantial gainful activity since April 18, 2018, the alleged onset date. R. 22. Anthony had "severe" impairments of coronary artery disease, COPD, multilevel degenerative disc disease with lumbago and cervicalgia, gouty arthritis, obesity, bipolar disorder, and attention deficit hyperactivity disorder ("ADHD"). *Id.* None of Anthony's

"severe" impairments met or equaled a relevant Listing. R. 23–25 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 3.02, 4.04, 12.04, 12.11). As part of his Listings analysis, ALJ Rippel found that Antony's severe mental impairments caused "moderate limitation[s]" in his overall capacities for understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. R. 24.

ALJ Rippel then evaluated Anthony's residual functional capacity ("RFC") and found that he could perform "light"[4] work, except that he could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; never climb ladders/ropes/scaffolds; occasionally perform overhead reaching with the bilateral upper extremities (one or both at a time); and tolerate occasional exposure to respiratory irritants and/or workplace hazards. R. 25. Further, Anthony was

> limited to simple, routine tasks[] in entry-level unskilled work with short and simple instructions; with routine, customary breaks after about 2-hour periods of work; no fast-paced production rate [sic]; limited to low-stress work (defined as involving only occasional independent decision making and/or changes in the work setting); requiring no interaction with the public and only occasional interaction with co-workers[] and/or supervisors; [and] as to co-workers, only occasional tandem tasks.

*Id.* Based on this RFC finding and the VE's testimony, ALJ Rippel determined that Anthony could not perform any of his past relevant work, R. 29, but that he could perform the requirements of certain light, unskilled jobs existing in the national economy, including routing clerk, merchandise marker, and photocopy machine operator, R. 30 (citing R. 56–58). Thus, the

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see* R. 25 (finding that Anthony could lift and/or carry "up to 20 pounds occasionally and 10 pounds frequently" and "stand[] and/or walk[] up to 6 hours and sit[] up to 6 hours in an 8-hour workday").

ALJ concluded that Anthony was "not disabled" from April 18, 2018, through the date of his decision. R. 31. The Appeals Council declined review, R. 6–11, and this appeal followed.

## III. Discussion

Anthony's sole contention on appeal is that ALJ Rippel failed to properly evaluate and explain his analysis of the opinion of DDS consultative examiner Nicole Surething, Ph.D. *See generally* Pl.'s Br. 1, 9–13 (citing R. 29, 349–50), ECF No. 20. Specifically, Anthony argues that the ALJ's analysis is deficient because he failed to discuss the supportability and consistency of Dr. Surething's opinion, as required by 20 C.F.R. § 404.1520c, and failed to build an "accurate and logical bridge" from the evidence to his conclusion that Dr. Surething's opinion was "partially persuasive." *Id.* at 12. Anthony's argument has merit. *Cf. Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 386 (4th Cir. 2021) (explaining that the prior version of this regulation, 20 C.F.R. § 404.1527(c), required "ALJs [to] consider each of the enumerated factors before assigning less than controlling weight to a medical opinion from a treating physician," and that remand was necessary where "the ALJ neglected to even acknowledge the existence of those factors, much less engage in a meaningful discussion of them, so as to facilitate judicial review"); *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 661 (4th Cir. 2017) (concluding that a regulation which "states the SSA *will* document application of the [special] technique in the decision" imposed mandatory duty of written explanation in evaluating mental impairments and explaining that an ALJ's "failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review").

A.   Summary

    1.   *Relevant Medical History*

In November 2018, Anthony presented to Kevin Forster, D.O., for a consultative physical exam. *See* R. 340–44. Relevant to his mental impairments, Anthony reported that he was not following treatment for his bipolar disorder, which in the past had been treated with Lithium, and he "state[d] he did well with his coworkers at his previous job until his recently physical complaints where his relationships changed." R. 340. On exam, Anthony had normal mood and affect, and his thought processes were linear and logical with "some perseveration on neck pain." R. 342. Dr. Forster opined that Anthony's mental health would likely improve with treatment. R. 343 ("Mental health: prognosis good with treatment.").

Anthony saw Laura Moyers, LCSW, for outpatient individual therapy from July 2019, R. 423, until February 2020, R. 467. During his weekly appointments, he generally reported feelings of depression and anger. *See, e.g.*, R. 431, 435, 441, 443, 453, 459. Ms. Moyers's notes consistently document objective abnormalities on Anthony's mental-status exams, including "pressured" speech, "tangential" thought processes, and "delusional" or "grandiose" thought content. *See, e.g.*, R. 426–27, 429, 431–33, 435, 437, 447, 449, 453, 457, 465. At his initial visit, Anthony said that he had "recently let go of every childhood friend that he ever had," R. 423, and reported lifelong difficulty interacting with peers and adults, R. 424. He expressed distrust for his physicians at various sessions, R. 441, 457; reported auditory hallucinations during a session in December 2019, R. 451; and expressed passive suicidal ideation in January 2020, R. 455. At one point, he asked Ms. Moyers "what he had to say to get him[self] committed for a 'short stay.'" R. 445 (Nov. 2019).

Later in January, Samantha Lucas, PMHNP, performed a psychological evaluation of Anthony. R. 469. Anthony described being anti-social, remarking that "people are a waste of time . . . you should probably just put me down . . . the planet is a torture box and if the box

6

doesn't start coughing up some answers I'm going to smash some heads." *Id.* On mental status exam, Anthony was restless and distracted, his speech was "difficult to interrupt and peppered with obscenities," and he had delusional thought content. R. 471. He made intermittent eye contact, he had dysphoric and labile affect, his thought processes were tangential, and his judgment and impulse control were "impaired." *Id.* NP Lucas diagnosed bipolar disorder, alcohol use disorder, unspecified personality disorder, and cannabis use disorder. *Id.* Anthony was prescribed Abilify and Quetiapine. *Id.* At another visit with NP Lucas later in January, Anthony said he was "concerned he may have been discharged from [his PCP's] practice [because of] recent threatening behavior toward his provider." R. 474–75; *see also* R. 461. Findings on his mental-status exam were generally the same. R. 475. At a February visit with NP Lucas, Anthony described a "chronically contentious" relationship with his stepfather, with whom he lived, and exam findings again remained generally the same. R. 479. At his February 2020 session with Ms. Moyers, Anthony said he felt "empty" and was "afraid that 'I don't care. I could take my buddy by the throat. My empathy is missing. I can see how a psychopath does what he does, you know.'" R. 467. He took his psychotropic medications as prescribed. R. 465, 467.

  2. *Medical Opinions*

  Dr. Surething performed a consultative psychological evaluation of Anthony in November 2018. *See* R. 346–50. Anthony was "cooperative but difficult to keep on track during the interview due to his staggering affect and manic mood," "presented as very grandiose throughout the examination," had "highly tangential" thought processes, his speech was "clear but very pressured," his psychological insight and judgment were "poor." R. 346; *see also* R. 347 ("Claimant had difficulty focusing when given directions.").

7

Dr. Surething provisionally diagnosed bipolar disorder, cannabis use disorder, and rule out schizoaffective disorder and personality disorder. R. 349. His prognosis was "highly guarded." R. 350. Based on Anthony's interview and mental-status exam, Dr. Surething opined that he had "no impairment" in his ability to perform simple and repetitive tasks and to understand and remember simple instructions; was "mildly impaired" in his abilities to maintain regular attendance in the workplace and to perform work activities on a consistent basis; was "moderately impaired" in his abilities to perform detailed and complex tasks and understand complex instructions, to perform work activities without special or additional supervision, and to deal with the usual stresses encountered in a competitive work environment; and was "significantly impaired" in his abilities to make judgments on complex work-related decisions, to accept instructions from supervisors, and to interact with coworkers and the public. *Id.* Dr. Surething also noted that Anthony "appear[ed] incompetent to manage his funds" because, although he had "the cognitive capacity" to do so, Anthony said that "he does not manage his money, often overdraws his bank account and does not trust himself." *Id.*

In December 2018, DDS reviewer Sreeja Kadakkal, M.D., assessed Anthony's mental impairments and RFC. *See* R. 73–77. She found that Anthony's severe bipolar disorder, R. 72, caused "mild" limitations in his overall ability to understand, remember, or apply information and "moderate" limitations in his overall abilities to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage himself, R. 73. Dr. Kadakkal opined that Anthony's "basic memory processes [were] intact," R. 75, he could "carry out short and simple instructions," R. 76, and he could "maintain regular attendance and be punctual," *id.* Further, despite Anthony's "history of difficulty interacting with supervisors and coworkers," he "retain[ed] the ability to ask simple questions, accept instructions, and work without distracting

8

others." R. 76 ("At recent CE appointments he was cooperative and appropriate for the exams/interviews."). *But see* R. 75–76 (opining that Anthony was "moderately limited" in his abilities to work with or near others without being distracted by them, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting). Lastly, Anthony appeared capable of making simple decisions and would be able to cope within a "stable-routine" environment. R. 76. Dr. Kadakkal explained that her review of the evidence demonstrated that Anthony "retain[ed] the abilities to manage the mental demands of low skilled, routine, repetitive tasks, as performed within a low social interaction work setting." R. 77.

In April 2019, DDS reviewer Howard Leizer, Ph.D., found that Anthony's severe bipolar disorder and ADHD caused "moderate" limits in all four broad areas of mental functioning. R. 90–91. Like Dr. Kadakkal, Dr. Leizer found that Anthony's basic memory processes were intact, and Dr. Leizer also found that Anthony could follow one- and two-step instructions. R. 95. Dr. Leizer also affirmed Dr. Kadakkal's findings that Anthony could maintain regular attendance and be punctual, retained the ability to ask simple questions, accept instructions, and work without distracting others, and could make simple decisions and would be able to cope with a stable-routine environment. R. 96 ("At recent CE appointments he was cooperative and appropriate for the exams/interviews."). *But see* R. 95–96 (opining that Anthony was "moderately limited" in the same functional areas). Dr. Leizer explained that Anthony "would be capable of understanding, remembering, and carrying out short, repetitive instructions w[ith] limited contact w[ith] the general public and supervisors." R. 97.

     3.    *Anthony's Statements*

9

Anthony submitted a Function Report to DDS in August 2018. *See* R. 236–43. He reported that he had problems getting along with family, friends, neighbors, and others, stating that his bipolar disorder and schizophrenia had "ruined [his] relationships" and that he hated all of his friends and told them to leave him alone. R. 241. He did not get along with authority figures "at all" and said he was "scared of their evil intent." R. 242. Further, he reported that he had been fired from jobs several times because of problems getting along with others. *Id.* In a Third Party Function Report submitted to DDS in March 2019, Anthony's mother noted that Anthony did not go out much because he "doesn't like people," he had "no social life," and he "like[d] living in the country to be away from people," R. 259. She also said that he did not get along well with authority figures "at all," that his relationships with authority figures had been an issue for most of his life, and that he "thinks authority figures are stupid." R. 260. Anthony testified at the administrative hearing in February 2020 that he had been fired from his previous job because of a conflict with his supervisor. R. 42.

B.   *Analysis*

Anthony challenges the ALJ's assessment of Dr. Surething's opinion and his RFC finding that Anthony could work full time as long as he did not interact with the public and had only "occasional interaction with co-workers[] and/or supervisors" and, "as to co-workers, only occasional tandem tasks," R. 25. *See* Pl.'s Br. 9–12 (discussing Dr. Surething's opinion that Anthony's abilities to accept instructions from supervisors and to interact with coworkers and the public were "significantly impaired"). A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant

10

evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

In determining a claimant's RFC, the ALJ will evaluate the medical opinion evidence of record. For claims filed after March 27, 2017, a "medical opinion" is a statement from a "medical source"[5] about what a claimant can do despite his or her impairments and whether one or more impairments causes limitations or restrictions in the ability to perform physical, mental, and other work demands and to adapt to environmental conditions in the workplace. 20 C.F.R. § 404.1513(a)(2)(i)–(iv). The ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id.* § 404.1520c(a). Instead, the ALJ "will articulate how [he or she] considered the medical opinions and prior administrative medical findings" in the claimant's record "according to paragraph (b)" of the governing regulation, 20 C.F.R. § 404.1520c. Paragraph (b) in turn "promise[s] claimants that ALJs 'will articulate in their determination or decision how persuasive they find all of the medical opinions'" in the case record, *Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *1 (E.D. Mich. Aug. 13, 2021) (quoting 20 C.F.R. § 404.1520c(b)), and instructs that "[t]he

---

[5] A "medical source" is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." 20 C.F.R. § 404.1502(d).

factors of supportability and consistency are the most important factors [ALJs] consider when they determine how persuasive [they] find a medical source's medical opinion . . . to be," 20 C.F.R. § 404.1520c(b)(2) (citations omitted). "Therefore, [ALJs] *will explain* how [they] considered the supportability *and* consistency factors for a medical source's medical opinions . . . in [the] determination or decision" on the disability claim. 20 C.F.R. § 404.1520c(b)(2) (emphasis added); *see Hardy*, 2021 WL 3702170, at *3 (concluding that § 404.1520c(b) creates "a procedural guarantee that an ALJ will explain—will 'articulate'—how persuasive [he or she] found each medical source . . . . but the regulations only require ALJs to discuss the . . . supportability and consistency" factors, and that "[f]or those two factors, the regulations further pledge that ALJs 'will explain how [they] considered the supportability and consistency factors for a medical source's opinions'" in the written decision) (quoting § 404.1520c(b)); *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01 (Jan. 18, 2017) (explaining that the final rules in § 404.1520c "require our [ALJs] to consider all of the factors" in § 404.1520c(c) "for all medical opinions and, at a minimum, to articulate how they considered the supportability and consistency factors" in determining persuasiveness) ("*Revisions to Rules*"). Put differently, § 404.1520c(b)–(c) states the "minimum level of articulation" ALJs must include in their written decisions "to provide sufficient rationale for a reviewing . . . court," *Revisions to Rules*, 82 F.R. 5844-01, "to determine whether the ALJ's decision is supported as a matter of fact *and* law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (emphasis added). *See Dowling*, 986 F.3d at 386; *Patterson*, 846 F.3d at 662; *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ

12

found credible and why, and specific application of the pertinent legal requirements to the record evidence. (internal citations omitted)).

"Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). "Consistency," on the other hand, means that "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the [record], the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2). Thus, the ALJ must articulate how he or she considered each of those factors in determining persuasiveness for all medical opinions in the claimant's record. *See Revisions to Rules*, 82 FR 5844-01 ("This articulation *will include* the supportability *and* consistency factors, which generally includes an assessment of the supporting objective medical evidence and other medical evidence, *and* how consistent the medical opinion or prior administrative medical findings [are] with other evidence in the claim." (emphasis added)); *cf. Black & Decker Corp. v. Comm'r*, 986 F.2d 60, 65 (4th Cir. 1993) ("Regulations, like statutes, are interpreted according to canons of construction. Chief among these canons is the mandate that constructions which render regulatory provisions superfluous are to be avoided." (internal quotation marks omitted)). ALJs "may, but are not required to, explain how [they] considered the factors" listed in § 404.1520c(c)(3)–(5), such as the source's medical specialty or treatment relationship with the claimant. *Id.* § 404.1520c(b)(2).

ALJ Rippel's decision does not meet this "minimum level of articulation," *Revisions to Rules*, 82 FR 5844-01. ALJ Rippel accurately summarized Dr. Surething's medical opinion, including her assessment that Anthony had "significant impairment of his ability to . . . accept

13

instructions from supervisors[] and ability to interact with coworkers and the public." R. 29; *see* R. 350. The ALJ's analysis of the opinion, however, consists of one conclusory sentence: "The undersigned finds this opinion partially persuasive because the limitations identified are vague; however, the record supports finding the [sic] capable of performing simple, routine tasks with additional limitations, including no social interaction with the public as detailed above[.]" R. 29.

ALJ Rippel's perfunctory explanation is entirely devoid of any analysis of "the most important factors" of supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). In her opinion, Dr. Surething explained that the limitations she attributed to Anthony were "[b]ased upon information collected in [the] examination," and were "a result of [Anthony's] current mental health symptoms." R. 350. Yet, despite 20 C.F.R. § 404.1520c(c)(1)'s instruction that in assessing the supportability of a medical opinion, the ALJ should evaluate the relevance of the provider's "supporting explanation," 20 C.F.R. § 404.1520c(c)(1), the ALJ does not mention this explanation, much less articulate how it impacted the opinion's persuasiveness, R. 29. *See Hardy*, 2021 WL 3702170, at *6 ("[A] rationale articulating how the ALJ applied the factors specified in the regulations must be stated for each source."). Nor does ALJ Rippel articulate how he evaluated the consistency of Dr. Surething's findings with "evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2). Some of the evidence of record appears to contradict or undermine certain limitations that Dr. Surething attributed to Anthony's mental impairments. *See, e.g.*, R. 343 (Dr. Forster offering "good" mental health prognosis with treatment); R. 76, 96. (Dr. Kadakkal and Dr. Leizer opining that Anthony could "ask simple questions, accept instructions, and work without distracting others"). Other evidence, however, is consistent with Dr. Surething's proposed limitations, particularly her findings that Anthony's abilities to accept instructions from supervisors and interact with

14

coworkers were "significantly impaired," R. 350. *See, e.g.*, R. 42 (Anthony testifying that he was fired from his last job because of conflict with his supervisor); R. 241–42 (Anthony reporting he hated all of his friends, did not get along with supervisors, and had been fired several times because of problems getting along with others); R. 441, 457 (Anthony reporting a distrust of physicians); R.467 (Anthony reporting lack of empathy and that he could "take [his] buddy by the throat"); R. 471 (NP Lucas's abnormal findings on mental examination); R. 474–75 (Anthony reporting threating behavior towards healthcare provider). Nonetheless, the ALJ provides no explanation as to the consistency of Dr. Surething's opinion with this evidence, or any of the evidence of record. *See* R. 29. Because he wholly failed to explain how he evaluated the supportability and consistency of Dr. Surething's opinion, ALJ Rippel has not satisfied the regulation's minimum "articulation requirement." *See Hardy*, 2021 WL 3702170, at *3–6 (collecting cases). Accordingly, I find that ALJ Rippel's evaluation of Dr. Surething's medical opinion was legally deficient.

Moreover, the ALJ failed to provide a logical explanation of how his assessment of Dr. Surething's opinion, as well as the other evidence in the record, supported his determination of the mental RFC limitations. The ALJ found Dr. Surething's opinion to be "vague," but also "partially persuasive," R. 29, and then concluded that "the record supports finding [Anthony] capable of performing simple, routine tasks with additional limitations, including no social interaction with the public[.]" *Id.* The ALJ's analysis falls well short of building an "accurate and logical bridge," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), from the evidence to his conclusion that Dr. Surething's opinion was "partially persuasive," R. 29. Indeed, ALJ Rippel offered no basis for this Court to discern which of those findings by Dr. Surething he accepted and which ones he rejected and why. *Cf. Mascio*, 780 F.3d at 640 ("Nowhere, however, does the

15

ALJ explain how he decided which of Mascio's statements to believe and which to discredit, other than the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering Mascio's [RFC]. The ALJ's lack of explanation requires remand."). Accordingly, remand is warranted. *See Testamark v. Berryhill*, 736 F. App'x 395, 399 (4th Cir. 2018) ("Absent more thorough and well-reasoned explanation, we cannot conduct meaningful judicial review of the ALJ's conclusions.").

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 21, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: July 27, 2022

*/s/ Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge